Memorandum of Decision
On January 6, 1997, the Department of Children and Families (DCF) filed a petition to adjudicate Shyliesh H., a minor child, as neglected. On February 9, 1998, prior to an adjudication of neglect, DCF filed a petition to terminate the rights of Shyliesh's parents, Tracy W. and Michael H. DCF amended the petition to add an additional ground for termination on September 25, 1998. A consolidated trial of the petitions took place on November 23, 24, and 30, 1998, December 2 and 3, 1998, and February 3, 1999.[2] On November 24, 1998, the court granted CT Page 2330 the motion of the paternal grandmother, Eva H., to intervene in the trial for the limited purpose of proving entitlement to guardianship of Shyliesh. For the reasons stated below, the court grants the neglect and termination petitions and denies the paternal grandmother's request for a transfer of guardianship.
FACTS
The court finds the following facts and credits the following evidence. The mother in this case, Tracy W., was born in 1966. She is a high school graduate. She has a long history of paranoid schizophrenia. Tracy had a baby boy in 1988 through a nonmarital relationship. After some DCF involvement in the case, the probate court transferred legal guardianship of the boy to the maternal grandmother, Mary W., who lives in the same house as the mother.
The father, Michael H., was born in 1962. He has an eleventh grade education. He has worked a variety of jobs over the years. In 1995, Michael began a relationship with the mother, which never culminated in marriage. Since at least 1996, the father has lived separately from the mother and, most recently the father has resided with his own mother. Eva H.
Shyliesh was born on July 31, 1996. The mother had abused alcohol during her pregnancy. On August 6, the mother was admitted to the Institute of Living, a Hartford psychiatric hospital, due to increasingly bizarre and dangerous behavior, hallucinations, and paranoia. DCF invoked a 96 hour hold on the baby, but did not seek an order of temporary custody and Shyliesh was returned to the home of the mother and maternal grandmother. The mother was discharged from the Institute of Living on August 22 with a recommendation that she continue her outpatient treatment at the Capitol Region Mental Health Center and that a visiting nurse service monitor her medication compliance.
Over the next four months, the mother would allow the baby to cry unattended for many hours at a time. At times Tracy did not hold or clothe the baby appropriately. The mother would not allow Mary W. to have access to the child. The mother had missed therapy sessions at Capitol Region and was not cooperating with the visiting nurses. In November, 1996, Shyliesh's pediatrician developed concerns that Shyliesh was experiencing suboptimal weight gain. The pediatrician discussed proper feeding techniques with the mother, including waking up the baby at night for feedings. CT Page 2331
Because of the reports from the pediatrician, DCF attempted to make a home visit on January 2, 1997 to assess whether the mother was properly feeding Shyliesh. When the mother refused to admit a DCF nurse practitioner and seemed to be acting irrationally, DCF called a mobile crisis team and the mother was again admitted to the Institute of Living. At that time, DCF received further information that the mother had not been consistent in attending her therapy sessions at Capitol Region or in taking her medication and on January 2, had fed Shyliesh only once by 3:00 p. m.
Based on all these concerns, DCF filed a petition for neglect and invoked another 96 hour hold on Shyliesh. On January 6, 1997, the court granted DCF an ex parte order of temporary custody and entered specific steps for the parents to follow in order to facilitate the return of their child. On January 17, the parents and the maternal grandmother entered into a service agreement with DCF. The service agreement and the specific steps required the father to cooperate with a psychological evaluation, required the mother to comply with her therapy and medication, and required both parents to maintain reasonable visitation. to avoid further involvement in the criminal justice system, and to attend parenting classes. In the service agreement the mother acknowledged that Mary W. would be the primary caretaker and that the mother would have to defer to Mary regarding all child care needs. On January 24, the court confirmed the order of temporary custody, transferred temporary custody to the maternal grandmother, and ordered that DCF provide protective supervision. The court also confirmed a provision of the service agreement providing for Shyliesh to spend every other weekend with the father, who had been visiting Shyliesh regularly at the mother's home.
At about this time, the father offered himself as a placement resource for Shyliesh. DCF rejected this suggestion because of concerns that he smoked marijuana, that he had taken Shyliesh out with him during the night, and that he was unemployed. During the ensuing months, the father was inconsistent in his weekend visitation and, on occasion, returned Shyliesh to her home on Saturday, before the end of the weekend. The father did not have a crib for the baby. The father failed to attend a psychological evaluation and parenting classes called for in his service agreement. The father also did not demonstrate any particular understanding of the mother's psychiatric illness or needs. CT Page 2332
Because of continued concern about Shyliesh's suboptimal weight, the pediatrician referred Tracy and Mary W. to Dr. Francisco Sylvester, a pediatric gastroenterologist at the Connecticut Children's Medical Center in Hartford. The mother and maternal grandmother then missed four of the next eight scheduled appointments, some of which were intended to instruct the care takers on how to insert a nasogastric tube into Shyliesh to boost her calorie input at night. The mother showed little insight into what was happening and would deny that there was a problem with the baby's weight. Contrary to her service agreement, the mother was not allowing Mary W. sufficient access to Shyliesh. The father did not participate in any of the outpatient appointments.
Ultimately Dr. Sylvester diagnosed Shyliesh with nonorganic failure to thrive, which is a condition of low body weight due to environmental factors and insufficient calorie intake that could affect brain development. Shyliesh was admitted to the hospital on May 30, 1997. At the time of admission, the mother and grandmother were confused about who had legal custody of the child.
Because it appeared that the parents did not fully appreciate the responsibilities associated with the nasogastric tube. DCF invoked its third 96 hour hold that evening. Shyliesh remained in the hospital until June 4. During that time, DCF prohibited family visitation. With nighttime feedings from the nasogastric tube and gradually increased daily oral feedings, Shyliesh perked up and began to interact with the hospital staff. On June 3, 1997, DCF obtained its second order of temporary custody, which was confirmed on June 13, 1997.
On June 17, DCF placed Shyliesh in the home of Heidi D., who was licensed to provide foster care for a medically fragile child. Shyliesh began to gain weight at a normal rate. In September, 1997, the doctor removed the nasogastric tube. By the first part of 1998, her doctor no longer considered Shyliesh medically fragile. Shyliesh became very comfortable in Heidi's care.
At the time of Shyliesh's placement in foster care, DCF established a regime of weekly visitation. The mother visited regularly but, at least at the outset, the father did not. The father missed some visits in July and October, 1997 because he was in jail for traffic offenses or related failures to appear. CT Page 2333 The father also brought candy to the visits on a number of occasions, despite being asked by DCF not to do so.[3]
The father began taking and ultimately completed parenting classes in 1998 and his interaction at visits with Shyliesh improved somewhat. His attendance record was better in 1998, though not exemplary. The mother acted appropriately at visits but with a tendency to remain somewhat passive, preferring to comb Shyliesh's hair. All the relatives would bring clothes for Shyliesh. Of concern to DCF was the fact that Shyliesh did not smile or seem responsive at visits. In the spring of 1998, Shyliesh would occasionally have tantrums at the foster home before going to visits. On March 10, 1998, Dr. Lisa Namerow, a child psychiatrist and pediatrician, diagnosed Shyliesh as having an attachment disorder of infancy with a flat affect.
On July 9, 1998, a disturbing incident took place at the regularly scheduled visit DCF office visit. A DCF social worker entered the visiting room and found the mother holding Shyliesh in one arm by her waist and pushing and swinging at the father with the other arm. The mother, whose mouth was dry and foaming, was insisting on taking Shyliesh outside. The father was trying to prevent her from doing so. Another DCF social worker entered the room and the mother began to assault her. The police arrived and, along with the father, tried to calm the mother down and give up Shyliesh. After thirty minutes of negotiating, a DCF worker finally convinced the mother to hand Shyliesh over.[4]
The mother was admitted to the Institute of Living on a physician's emergency certificate. The admitting personnel learned that the mother had not been attending individual therapy sessions for the previous two months and, apparently, that she had not been compliant with her medication for the previous month. After being stabilized, the mother was discharged on August 20, 1998 with a continuing diagnosis of paranoid schizophrenia.
Shyliesh had remained in frozen fear throughout the incident. Afterwards, she was visibly shaken. In the ensuing days, Shyliesh would wake up screaming with nightmares, and have tantrums during the day. DCF suspended visits until August 6, 1998. Visits then resumed without incident.
Dr. Namerow reexamined Shyliesh on November 18, 1998. Shyliesh's development had by then reached normal levels for her CT Page 2334 age, although she continued to exhibit extreme mood swings and oppositional behavior. She had become quite attached to her foster mother. Without her foster mother present, Shyliesh exhibited a flat affect and "frozen watchfulness," which is a state in which a person watches others carefully but does not engage with them.
Dr. Namerow diagnosed Shyliesh as having a reactive attachment disorder, which means she is restricted in her ability to interact with adults. This disorder is often seen in conjunction with the nonorganic failure to thrive that Shyliesh experienced. Together, they are an outcome of disturbed care taking. Shyliesh's prognosis in overcoming the attachment disorder is guarded, particularly because of her genetic predisposition for schizophrenia. Dr. Namerow recommended strongly against moving Shyliesh out of her foster home. According to Dr. Namerow, if a child with an attachment disorder does attach to an adult, as Shyliesh has, this attachment should not be disturbed.
The father testified at trial. The father loves Shyliesh very much, but he was unaware that Shyliesh had any special needs and was unfamiliar with the names of her past and present pediatricians. He demonstrated limited understanding of the role of DCF and the court in the process he had been through for the previous two years. Although the father showed initiative in the parenting classes that he took, he testified that he did not see any special need for parenting classes. He minimized his responsibility for his criminal offenses, as he had done six months earlier in an evaluation by a court-appointed psychologist.[5]
Shyliesh is playful, talkative, and comfortable in Heidi D.'s home. Shyliesh has in fact become quite attached to Heidi. She has a good rapport with her foster siblings. As of October 22, 1998, however, when DCF filed its latest social study, DCF did not seem committed to Heidi D.[6] DCF did not call Heidi D. as a witness and, on direct examination of its case worker, did not establish that Heidi was interested in adopting Shyliesh. Upon questioning by the court, DCF attempted to clarify its position by stating that, in view of Dr. Namerow's November, 1998 report, it now favored Heidi D. as an adoptive parent and Heidi was interested in adopting Shyliesh, although it had yet not fully evaluated Heidi for those purposes.
The paternal grandmother, Eva H., is sixty-one years old. She CT Page 2335 has only an eighth grade education, but has worked hard all her life. Most recently she retired after twenty-five years of service at the Sisters of Saint Joseph convent, where she worked in the kitchen. She raised four children and now has several grandchildren. The paternal grandmother has diabetes, but it is in control, and she is otherwise in good health.
The paternal grandmother first saw Shyliesh about one month after her birth. She would then see Shyliesh and assist the father on the weekends when the father would have Shyliesh at their house. The paternal grandmother met DCF representatives in August, 1996, when DCF did an initial assessment of the home she shared with the father, and in January, 1997, when the court transferred temporary custody of Shyliesh to the maternal grandmother. Apparently during the summer of 1997, the paternal grandmother offered her daughter Darlene H. as a placement resource for Shyliesh. DCF declined to consider Darlene because she had a record of arrests for domestic violence and did not have the economic resources to commit herself to Shyliesh.
After Shyliesh went into foster care in June, 1997, the paternal grandmother visited Shyliesh a total of only five or six times. More visits did not take place because of a conflict between Eva's work schedule and DCF's desire to accommodate the foster mother's schedule. The grandmother attempted to interact with Shyliesh at the visits, but Shyliesh was somewhat unresponsive.
In early 1998 when the paternal grandmother initially learned of DCF's plan to pursue a termination of parental rights, the grandmother first offered herself as a placement resource. The paternal grandmother formally moved to intervene in the case in March, 1998. DCF opposed the motion. The court denied the motion without prejudice and ordered DCF to investigate Eva's home and report by June 4, 1998 in order to assist Dr. Meier with an evaluation scheduled for that day. See note 5 supra. DCF and the paternal grandmother again were unable to coordinate schedules and the home visit did not take place by the time of the June 4 evaluation or the June 30, 1998 report submitted by Dr. Meier. The DCF worker reported to Dr. Meier orally on the paternal grandmother, although the DCF worker did not mention that the grandmother owned a condominium, and was planning to retire from her long-standing job. Dr. Meier reported on June 30 that the paternal grandmother was stable, mature, and good with Shyliesh but that she let the father take the lead during the interactive CT Page 2336 session. Dr. Meier added that it was somewhat questionable whether there was a strong bond between Eva and Shyliesh.
The paternal grandmother told Dr. Meier that she had recently become aware of Shyliesh's special needs. The paternal grandmother was also present in court in late November, 1998, when Dr. Namerow testified. The paternal grandmother nonetheless testified on February 3, 1999 that she did not have an understanding of Shyliesh's emotional needs or of her reactive attachment disorder. She added that she could follow directions for giving medication to Shyliesh but recognized that any transition from the foster home would be difficult. The paternal grandmother acknowledged that Shyliesh did not know her very well.
NEGLECT ADJUDICATION
The neglect petition alleges that, as of January 6, 1997, Shyliesh was neglected in that, as provided in the relevant statute, she was "being denied proper care and attention, physically, educationally, emotionally or morally." See Conn. Gen. Stat. § 46b-120(8)(B). A contemporaneous amendment to the petition alleges that Shyliesh was "uncared for" in that, under the relevant statutory definition, her mother's home cannot provide the "specialized care which the physical, emotional or mental condition of the child requires." See Conn. Gen. Stat. § 46b-120(9). DCF has the burden of proving these allegations by a fair preponderance of the evidence. See Practice Book §33-12.
The trial established that Shyliesh was neglected within the meaning of the statute in that the mother was not feeding the baby adequately and was not allowing the maternal grandmother access to the baby, thereby denying the baby proper care. As a result of this disturbed caretaking by the mother, Shyliesh developed a physical condition known as failure to thrive. Especially with the benefit of hindsight, the Court also can say that Shyliesh was "uncared for" in that the mother and the maternal grandmother were not able to provide the specialized care, such as use of the nasogastric tube, that Shyliesh's condition required. See In re Kelly S., 29 Conn. App. 600, 613
(1992) (uncared for statute requires only proof of ongoing parenting deficiencies and not actual incidents of abuse or neglect). Accordingly, DCF has proven both that Shyliesh was neglected and that she was uncared for. CT Page 2337
TERMINATION ADJUDICATION
A. Reunification
In order to terminate parental rights, DCF must initially show by clear and convincing evidence that DCF "has made reasonable efforts to locate the parent and to reunify the child with the parent, unless the court finds in this proceeding that the parent is unable or unwilling to benefit from reunification efforts." Conn. Gen. Stat. § 17a-112(c)(1).[7] In the present case, DCF left Shyliesh in either her mother's custody or her mother's household for almost a year with virtually unrestricted visitation by the father. After June, 1997, when Shyliesh went into foster care, the parents had weekly visitation. DCF also made referrals to parenting classes, and to individual therapy and counseling. The court finds, based on this evidence, that DCF has made reasonable efforts to reunify the parents with the child.
B. Statutory Grounds
To prevail in a nonconsensual termination of parental rights case, DCF must also prove by clear and convincing evidence that one of several statutory grounds for termination exists. See Inre Michael B., 49 Conn. App. 510, 512 (1998); Conn. Gen. Stat. § 17a-112(c)(3). In this adjudicatory phase, the court is limited to events preceding the filing of the petition or the latest amendment. See Practice Book § 33-3(a). The relevant date in this case is thus September 25, 1998.
DCF has alleged the ground of abandonment against the father, and the grounds of failure to rehabilitate and acts of commission or omission against both parents. The court finds that DCF has proven failure to rehabilitate against both parents and acts of commission or omission by the mother by clear and convincing evidence.
 1. Abandonment
General Statutes § 17a-112(c)(3)(A) provides that a ground for termination exists when "[t]he child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child." "Attempts to CT Page 2338 achieve contact with a child, telephone calls, the sending of cards and gifts, and financial support are indicia of `interest, concern or responsibility' for the welfare of the child." In reMigdalia M., 6 Conn. App. 194, 208-209, cert. denied,199 Conn. 809 (1986). Conversely, "where a parent fails to visit a child, fails to display any love or affection for the child, has no personal interaction with the child, and no concern for the child's welfare, statutory abandonment has occurred." Id.
at 209. The statutory term "maintain" implies a "continuing, reasonable degree of concern." Id. at 210.
The court finds that, on the whole, the father did not abandon Shyliesh. In 1996, he visited regularly. In 1997, the father's visitation became inconsistent. From the beginning of 1988 through September, 1998, which is the end of the adjudicatory period, the father's visitation, while not exemplary, improved somewhat. Although Shyliesh has not always been responsive, the father has tried to play with her. He has brought clothes for the child. Even his bringing of candy for Shyliesh, while misguided and contrary to DCF's instructions, does show his affection for the child. It is clear from the father's testimony that he loves Shyliesh and maintains a reasonable degree of concern about her. The evidence is not clear and convincing that he has abandoned her.
 2. Failure to Rehabilitate
By its September 25, 1998 amendment to the termination petition, DCF alleges that both parents have failed to rehabilitate under General Statutes § 17a-112(c)(3)(B) as amended by section 8 of Public Act 98-241. The amended version of § 17a-112(c)(3)(B) provides for termination when:
the parent of a child who (1) has been found by the Superior Court to have been neglected or uncared for in a prior proceeding, or (2) is found to be neglected or uncared for and has been in the custody of the commissioner for at least fifteen months and such parent has been provided specific steps to take to facilitate the return of the child to the parent pursuant to section 46b-129, as amended by this act, and has failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." CT Page 2339
1998 Public Acts, No. 98-241, § 8. This section of the Public Act took effect on July 1, 1998. See Public Acts 1998. No. 98-241, § 18. DCF argued at trial that the amendment applies to facts or events that predated July 1 as long as the petition, or in this case the amendment to the petition, was filed after July 1, 1998. The other parties did not object to this argument and the court hereby adopts it. See Peck v. Jacquemin,196 Conn. 53, 57-58 n. 10 (1985); In re Migdalia M., 6 Conn. App. at 200.
The 1998 amendment added the language in subparagraph (2) of the above text that refers to a child who is "found to be neglected or uncared for and has been in the custody of the commissioner for at least fifteen months and such parent has been provided specific steps to take to facilitate the return of the child to the parent." See id. § 8. The effect of the amendment is to make the ground of failure to rehabilitate clearly available in coterminous cases such as the present one, where there has been no prior adjudication of neglect. The clear implication of subparagraph (2) is that the court can premise a finding of failure to rehabilitate on a contemporaneous rather than a prior finding of neglect.
In the present case, this court has made the preliminary finding of neglect. There also can be no dispute that Shyliesh has been in DCF custody from June 3, 1997 to September 25, 1998, which constitutes the requisite fifteen months. In addition, the court imposed specific steps on June 6, 1997, thus satisfying that element of the statute.
The remainder of the statute requires the court to find whether the parent has "failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, such parent could assume a responsible position in the life of the child." Conn. Gen. Stat. § 17a-112(c)(3)(B). This portion of the amended statute, which is identical to prior law, requires the court to focus on the parents' rehabilitative status "as it relates to the needs of the particular child, and further, that such rehabilitation must be foreseeable `within a reasonable time.'" In re Luis C., 210 Conn. 157, 167 (1989). The statute, however, does not require parents "to be able to assume full responsibility for a child, without the use of available support programs." In re Jessica M., 49 Conn. App. 229, 240 (1998) (internal citation omitted). CT Page 2340
The court does not believe, first of all, that the mother can assume a responsible position in Shyliesh's life. She has not done so in the past. When the mother had custody of Shyliesh, the mother did not feed her properly, leading to the baby's condition of failure to thrive. When Mary W. became the guardian, the mother would not allow Mary M. sufficient access to Shyliesh, contrary to the mother's service agreement. Together the mother and maternal grandmother missed four important appointments with the pediatric gastroenterologist. On July 9, 1988, the mother endangered the safety of Shyliesh by holding her while assaulting the father and the social worker and by trying to take Shyliesh outside of DCF offices without their permission. Over the course of this case, the mother has been hospitalized for psychiatric reasons on three separate occasions, including most recently in July, 1998. The mother has not been consistent in compliance with her medication and outpatient therapy for her chronic schizophrenia. The court finds that DCF has proven the mother's failure to rehabilitate by clear and convincing evidence.
The father also has failed to rehabilitate himself. The father did not comply with key provisions of the January, 1997 service agreement and specific steps. The father was arrested and went to jail in July and October, 1997 for traffic offenses or related failures to appear. The father failed to comply initially with the obligation to attend parenting classes and a psychological evaluation. He did not visit consistently in 1997 or show the commitment necessary to keep Shyliesh in his home. He did not actively participate in Shyliesh's treatment for a serious medical condition.
Even in 1998, while the father has become somewhat more involved in visitation, he does not demonstrate the type of understanding necessary to be a parent of Shyliesh. He did not know the name of her pediatricians. Of critical importance is the fact that the father did not know that Shyliesh had any special needs. Although the father did complete parenting classes in 1998, he did not see much purpose in taking them. The father's testimony revealed that, while he cares for Shyliesh, he does not have the insight to deal with her guarded psychiatric prognosis.
Finally, the father's recent minimization of and failure to disclose his criminal record concerns the court. A parent sets a poor example for a child when, as here, he denies responsibility for his past mistakes or fails to disclose them at all. For all CT Page 2341 these reasons, the court finds that the evidence is clear and convincing that the father has failed to rehabilitate.
 3. Acts of Commission or Omission
General Statutes § 17a-112(c)(3)(C) authorizes the termination of parental rights when the child "has been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for his physical, educational, moral or emotional well-being." This provision authorizes termination when "specific acts of parental commission or omission" have caused injury to the child. See In re FeliciaD., 35 Conn. App. 490, 502, cert. denied, 231 Conn. 931 (1994). The ground does not permit termination "based on speculation as to what acts may befall a child." In re Kelly S.,29 Conn. App. 600, 614 (1992).
The court finds that Shyliesh's failure to thrive and reactive attachment disorder constitute the type of physical and emotional injury, respectively, contemplated by the statute. The testimony established that the condition of failure to thrive could affect brain development. The evidence also revealed that the prognosis for Shyliesh in overcoming her reactive attachment disorder, which is an emotional injury, is only guarded.[8]
Dr. Namerow's testimony confirmed that Shyliesh's physical and emotional conditions were the product of disturbed care taking. The only disturbed care taking in this case, such as the failure to feed the child regularly, was that of the mother. Further, the failure to thrive condition developed at a time when Shyliesh was in her mother's care. The only logical conclusion is that the mother's acts and omissions caused both the physical and emotional conditions that Shyliesh has experienced. Accordingly, the court finds that DCF has proven the ground of commission/omission against the mother.
The court reaches a different conclusion with regard to the father. It is true that a noncustodial parent such as the father here can be liable under the commission/omission statute if he commits an act that injures a child. See In re Sean H.,24 Conn. App. 135, 143-46 (1991) (noncustodial parent who murders mother thereby causing emotional injury to the children falls within statute). But the statute requires, at a minimum, that the parent, whether custodial or noncustodial, commit an "act or acts" of commission or omission. Since there is no evidence that CT Page 2342 the father was responsible for any injurious act of commission, the only possible argument is that, by neglecting Shyliesh when she was in her mother's or maternal grandmother's care. the father committed an "act" of omission. Putting aside the fact that an "act" of omission is somewhat of an oxymoron, there must be some point at which an omission no longer constitutes an "act." Thus, for example, a parent cannot ordinarily be liable under the commission/omission statute when the child is in foster care since birth. See In re Kelly, 29 Conn. App. 600, 614 (1992). The situation here is analogous because the father, unlike the mother, did not have a duty to feed, clothe, and protect Shyliesh on a day-to-day basis. The mother's failure to feed Shyliesh adequately was not primarily or directly the responsibility of the father. Therefore, the evidence does not support the claim that the father committed injurious acts of commission or omission.
 4. One Year Requirement
General Statutes § 17a-112(c)(3) requires that, with one exception not pertinent here, the statutory grounds for termination must have existed for at least one year unless the court waives the one year requirement based on the standards set forth in § 17a-112(d).[9] The court finds that the statutory grounds supporting the termination of parental rights to the children existed for more than one year prior to the September, 25 1998 the adjudicatory date.
DISPOSITION OF THE TERMINATION PETITION
In the dispositional phase of a termination case, the court must consider whether the State has proven by clear and convincing evidence that "termination is in the best interest of the child." Conn. Gen. Stat. 17a-112(c)(2). The court can consider all events occurring through the close of the dispositional hearing. Practice Book § 33-5.
The best interests of the children clearly and convincingly require termination of the parental rights of Tracy W. and Michael H. to Shyliesh H. for all the reasons stated above and below. In sum, the mother has chronic schizophrenia that has relapsed to the detriment of Shyliesh. Shyliesh developed serious physical and emotional conditions due to the mother's neglect of her child. The father does not demonstrate the type of maturity, insight, and commitment necessary to raise Shyliesh, especially CT Page 2343 given that Shyliesh has an attachment disorder with a guarded psychiatric prognosis.
The remaining issue is whether Shyliesh has a need for permanency in her current placement with Heidi D. This issue is critical because, if DCF and Shyliesh are not wedded to the current foster home, then the need for termination diminishes and the argument that Shyliesh should be reunited with her biological family becomes stronger. See In re Kezia M., 33 Conn. App. 12, 22
(1993). Thus it is puzzling that DCF did not emphasize this issue at trial. DCF did not single Heidi D. out as a favored placement in its most recent social study, it did not establish on direct examination of its case worker that Heidi was interested in adopting Shyliesh, and it did not call Heidi as a witness. Nonetheless, the questioning by the court and the other parties established that DCF favored Heidi as an adoptive parent and that Heidi would like to adopt Shyliesh. The court is satisfied that the interest of Shyliesh in a permanent placement with Heidi clearly and convincingly outweigh the interest of the biological parents in retaining rights to their daughter.
In arriving at a decision, the court must consider and make written findings regarding seven factors set out in General Statutes § 17a-112(e). See In re Tabitha P., 39 Conn. AR. 353, 362 (1995). A discussion of these factors follows.
1) The timeliness, nature and extent of services offered, provided and made available to the parent and child by an agency to facilitate the reunion of the child with the parent.
Based on the foregoing discussion, the court finds that DCF provided foster care for Shyliesh and offered the parents visitation. Pursuant to a service agreement, DCF also made referrals to parenting classes, and to individual therapy and counseling. These services were relevant to the needs of the parties and were offered in a timely manner.
2) Whether DCF has made reasonable efforts to reunite the family pursuant to the federal Adoption Assistance and Child Welfare Act of 1980.
Based on the foregoing discussion, the court finds that DCF offered the parents appropriate services and guidance, and sufficient time to permit family reunification. CT Page 2344
3) The terms of any applicable court order entered into and agreed to by any individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
As stated, on January 6, 1997, the court entered specific steps for the parents to follow in order to facilitate the return of Shyliesh. The principal specific steps required the parents to maintain reasonable visitation, to avoid involvement in the criminal justice system, and to attend parenting classes and counseling, and required the mother to take her medication as prescribed. The mother complied except for the important requirement that she follow her therapists' orders with regard to individual counseling and medication. The father's compliance with the specific steps stated above was not adequate.
4) The feelings and emotional ties of the child with respect to his parents, any guardian of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
As stated above, Shyliesh does not exhibit strong emotional ties to her natural parents. Shyliesh has become attached to Heidi D., her foster mother, in whose home she has thrived.
5) The age of the child.
Shyliesh is now two and one-half years old. She has been in temporary foster care for approximately one year and eight months. Our Supreme Court has long recognized the deleterious effect of prolonged temporary care of abused and neglected children. See In re Juvenile Appeal (83-CD), 189 Conn. 276, 292
(1983). The Appellate Court has observed that "[b]ecause of the psychological effects of prolonged termination proceedings on young children, time is of the essence in custody cases." In reAlexander V., 25 Conn. App. 741, 748 (1992). Thus it is not in the best interest of Shyliesh to keep her in a foster care setting that is legally temporary. Especially given her psychiatric profile, Shyliesh is entitled to the permanency that termination provides.
6) The efforts the parent has made to adjust his circumstances or conditions to make it in the best interests of the child to return him to his home in the foreseeable future, CT Page 2345 including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications or contributions and (B) the maintenance of regular contact or communication with the guardian or other custodian of the child.
Based on the foregoing discussion, the court finds that the parents have not been successful in the efforts they have made to adjust their circumstances or conditions to facilitate reunification. The mother did maintain regular visitation with Shyliesh once DCF took custody. The father did not maintain regular contact with Shyliesh in 1997 and, although his visitation improved in 1998, it was not exemplary.
7) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person, or by economic circumstances of the parent.
Based on the foregoing discussion, the court finds that the parents cannot blame each other, any other person, or economic circumstances for their own parenting shortcomings.
THE REQUEST TO TRANSFER GUARDIANSHIP
The court ruled during the course of trial that it has authority to transfer guardianship to a grandparent even after termination of the parents' rights. See generally Conn. Gen. Stat. § 17a-112(g), (i) (1997). The question presented here is whether this court should exercise this authority. Because it is the paternal grandmother who seeks the transfer of guardianship, she bears the burden of proof in establishing by a preponderance of the evidence that the best interest of Shyliesh warrants granting her request.
The paternal grandmother unquestionably has a vast amount of experience in raising children. She is a stable and mature person who has worked hard all her life. There also can be no dispute that she loves Shyliesh and has an understandable desire to keep her with her biological family.
But the court believes that the paternal grandmother lacks the commitment and understanding necessary to become a full time CT Page 2346 guardian of Shyliesh. The paternal grandmother has seen Shyliesh only five or six times in the last year and one-half. Although DCF was not overly flexible in accommodating Eva H.'s work schedule, Eva H., for her part, did not make extra efforts to make visiting Shyliesh a priority over her work. The grandmother did not come forward as a placement resource for Shyliesh until DCF had committed itself to termination, even though the grandmother clearly knew of DCF's involvement in this case from the outset. Although here again the grandmother's efforts to intervene in the case and to have herself evaluated as a placement met with some resistance from DCF, the grandmother did not present any evidence that she took the initiative and attempted to vary her schedule so that she could move the evaluation process along.
The grandmother admits that she does not know Shyliesh very well. Of great concern to the court is that, even though Eva has known of Shyliesh's special needs since at least the latter half of 1998, she does not seem to have much appreciation of the gravity of Shyliesh's emotional problems. Simply administering medication to Shyliesh will not be sufficient to address her reactive attachment disorder. Dr. Namerow's testimony made clear that moving Shyliesh out of her foster home would be a deeply disturbing event. Thus if it were to happen, the grandmother would have to devote tremendous energy and obtain extensive support to make it succeed. The grandmother's testimony simply did not persuade the court that she fully understands what is involved. For all these reasons, the court finds that Eva H. did not carry her burden in establishing that the best interest of Shyliesh warrants a transfer from the foster mother to the paternal grandmother.
CONCLUSION
Based upon the foregoing findings, the court determines that it is in the best interest of Shyliesh H. for a termination of parental rights to enter with respect to the mother, Tracy W., and the father, Michael H., and to deny the request to transfer guardianship to the paternal grandmother. Accordingly, the court hereby terminates all parental rights and denies the paternal grandmother's request. The court further orders that the Commissioner of DCF is appointed statutory parent for these children for the purpose of securing an adoptive family. The Commissioner shall file with this court no later than 90 days following the date of judgment a written report of efforts to CT Page 2347 effect such permanent placement and file further reports as are required by state and federal law.
It is so ordered.
 Carl J. Schuman Judge, Superior Court